IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

RODNEY K. ADAMS, *et al.*,
    Appellants,

        v.                               Civil No. 3:22cv237 (DJN)

LYNN L. TAVENNER, *as Chapter 7 Trustee*,
    Appellee.

## **MEMORANDUM OPINION**

This appeal from the United States Bankruptcy Court for the Eastern District of Virginia ("Bankruptcy Court") challenges that court's denial of Appellants' request to amend the equity security holders list ("ESH List" or the "List") filed by the Liquidating Trustee in Bankruptcy Case No. 19-34574-KRH. Appellants, who were partners in the now-defunct law firm LeClairRyan, PLLC ("LeClairRyan" or the "Firm"), challenge the ESH List due to tax consequences flowing from their placement on the List. But those tax consequences have no influence here, as the sole issues before the Court are (1) whether the Bankruptcy Court erred in authorizing the Trustee's continued use of the ESH List and (2) whether the Bankruptcy Court erred by interpreting the Firm's Operating Agreement to find that Appellants were correctly included on the List.

Finding that the Bankruptcy Court acted properly in granting the Trustee's Motion to Authorize and denying the Appellants' Motion to Amend and the Motions for Joinder, the Court hereby AFFIRMS IN PART and REVERSES IN PART the Bankruptcy Court's rulings. The Court AFFIRMS the Bankruptcy Court's rulings on the motions at issues but REVERSES IN PART to the extent that the Bankruptcy Court improperly ruled that the Trustee may rely on

future revisions of the ESH List, as that aspect of the Bankruptcy Court's ruling constituted an improper advisory opinion. In doing so, the Court REMANDS to the Bankruptcy Court with instructions to strike the offending language from its Order, as well as to correct the date of the ESH List to September 3, 2019. The Court AFFIRMS in all other aspects.

This case arises out of the bankruptcy case voluntarily commenced by LeClairRyan PLLC, initially under Chapter 11 of the Bankruptcy Code, on September 3, 2019, in the United States Bankruptcy Court for the Eastern District of Virginia. On September 17, 2019, LeClairRyan filed its List of Equity Security Holders Pursuant to Rule 1007(a)(3) of the Federal Rules of Bankruptcy Procedure. (Consolidated Joint Appellants' Appendix ("JA") (ECF Nos. 12, 13, 14) 146–51.) The List identified certain attorneys who were Members of the Firm as of July 29, 2019. The bankruptcy case was converted to a case under Chapter 7 of the Bankruptcy Code on October 4, 2019, and, as a result, the ESH List became part of the Chapter 7 proceeding. *See infra* Section IV.B.2. The United States Trustee appointed Lynn L. Tavenner (the "Trustee") as the Chapter 7 Trustee of the Firm's bankruptcy estate. (Trustee's Appendix ("TA") (ECF No. 17) 25.)

Immediately after her appointment, the Trustee began using the List to file taxation documents for the Estate. Due to the tax burdens imposed by membership on the List, Appellant Gary D. LeClair ("LeClair") and other List-members sought amendment of the List by the Trustee. When the Trustee declined, the Trustee sought authorization of her continued use of the List by the Bankruptcy Court; in response, LeClair sought amendment of the List by the court, requesting that he be removed from the List. Other Appellants later moved the Bankruptcy Court to join LeClair's Motion, also seeking removal of their names from the List to avoid List-membership's taxation consequences.

The Bankruptcy Court issued two orders on April 22, 2022 (JA 862) and April 28, 2022 (JA 865).  The court first denied LeClair's Motion to Amend Debtor's Equity Security Holders List Pursuant to Bankruptcy Rule 1009(a) ("Motion to Amend") (JA 410).[1]  The second Order granted the Trustee's Motion for an Order Approving (I) The Trustee's Reliance on Debtor's List of Equity Security Holders and (II) Procedures for Obtaining Copies of Filed Tax Returns and Memorandum in Support Thereof ("Motion to Authorize") (JA 152).  LeClair and certain former attorneys of the Firm[2] (collectively, "Appellants") filed notices of appeal to this Court, challenging these two Orders, which the Court consolidated into this action.[3]  In these appeals, Appellants challenge the Bankruptcy Court's ability to grant the Motion to Authorize on

---

[1]      Three joinder motions accompanied this Motion in the Bankruptcy Court:  (1) Joinder of Certain Former LeClairRyan, PLLC Attorneys to Motion to Amend Debtor's Equity Security Holders List Pursuant to Bankruptcy Rule 1009(a) (JA 533), filed by Megan Ben'Ary, Steven Blaine, James Carroll, Brian Donnell, Robert Fletcher, Robert Harrison, Charles Horn, Ray King, David Lay, Ilan Markus, David Phillips, Christopher Pizzo, Christopher Perkins, Thomas Regan, Peter Van Zandt, Robert Wayne, Andrew White, Diane Wilson, Robert Wonneberger, and Karen Yates; (2) Rodney K. Adams, John T. Jessee, Paul C. Kushnel, and Andrew K. Clark's Joinder to Gary D. LeClair's Motion to Amend Debtor's Equity Security Holders List Pursuant to Bankruptcy Rule 1009(a) (JA 583); and (3) Joinder of Two Additional Former LeClairRyan, PLLC Attorneys to Motion to Amend Debtor's Equity Security Holders List Pursuant to Bankruptcy Rules 1009(a) (JA 735), filed by Gretchen Jackson and Robin Teskin (collectively, "Joinder Motions).  The Bankruptcy Court denied the Joinder Motions "to the extent they are requests for relief" in its Order Denying Motion to Amend (JA 863).  While the Joinder Motions are also on appeal, the Court will treat them simultaneously with the Motion to Amend, as the Appellants do in their briefs.

[2]      Rodney K. Adams, Andrew K. Clark, Gretchen Jackson, John T. Jessee, Paul C. Kuhnel, Robin Teskin, Megan Ben'Ary, Steven Blaine, James Carroll, Brian Donnell, Robert Fletcher, Robert Harrison, William Michael Holm, Charles Horn, Ray King, Joseph Lagrotteria, David Lay, Ilan Markus, Christopher Perkins, David Phillips, Christopher Pizzo, Thomas Regan, Peter Van Zandt, Robert Wayne, Andrew White, Diane Wilson, Thomas Wolf, Robert Wonneberger and Karen Yates.

[3]      The other appeals consolidated into this action are Case No. 3:22cv235 and Case No. 3:22cv238, pursuant to the Court's May 25, 2022 Order (ECF No. 7).

jurisdictional grounds, as well as the Bankruptcy Court's interpretations of LeClairRyan's Operating Agreement (JA 211) and July 29, 2019 Resolution (JA 296).

As discussed below, the Court holds that the Bankruptcy Court correctly granted the Trustee's Motion to Authorize and properly denied both Appellant's Motion to Amend and the Motions for Joinder. Accordingly, the Court AFFIRMS IN PART the Bankruptcy Court's Order granting the Trustee's Motion to Authorize, but REVERSES IN PART to the extent that the Bankruptcy Court improperly ruled that the Trustee may rely on future revisions of the ESH List, as that aspect of the Bankruptcy Court's ruling constituted an improper advisory opinion. The Court further AFFIRMS the Bankruptcy Court's Order denying LeClair's Motion to Amend and accompanying Motions for Joinder.

## I.       FACTUAL BACKGROUND

Founded in 1988, LeClairRyan PLLC was a national law firm with twenty-five offices around the country. (TA 3.) At its peak, the Firm employed approximately 385 attorneys, including around 160 shareholders, and represented thousands of clients. (TA 3.) In 2018, the Firm converted from a professional corporation to a Virginia professional limited liability company. (TA 42.) In doing so, it adopted the Fourth Amended and Restated Shareholders Agreement of LeClairRyan, A Professional Corporation and Operating Agreement of LeClairRyan PLLC ("Operating Agreement"). (JA 211.) This Agreement governed the Firm's operations thereafter.

### A.       Operating Agreement

The Operating Agreement, dated February 28, 2018, controls the present appeal, as it governed throughout the time period at issue. The Agreement defines who is a Member of LeClairRyan and when, if at all, this Membership terminates; when and how Members can vote,

4

and on what; and how and when the Firm could be dissolved.  The relevant Sections are as

follows:  Article I, Section 1.01 "Certain Definitions" and Section 1.02 "Interpretation"; Article

II, Section 2.02 "Purchase of Section 2.02 Common and Section 2.02 Preferred Upon

Termination of Employment"; Article V, Section 5.03 "No Withdrawal"; Article IX, Section

9.08 "Authority and Rights of Members; Member Meetings"; and Article XI, Section 11.01

"Events of Dissolution" and Section 11.02 "Effectiveness of Dissolution."[4]

### B.      Dissolution and Liquidation

On July 29, 2019, a meeting of the Members of LeClairRyan occurred.  (JA 297.)

Following a vote of the majority of the Members present and voting, the Members adopted the

LeClairRyan PLLC Resolution of Members (the "Resolution" or the "Dissolution Resolution"),

which "[resolved], that the Firm shall be dissolved, consistent with the provisions hereof and

upon the Effective [D]ate established by the Dissolution Committee[.]"  (JA 297.)  The

Resolution also established the Dissolution Committee[5] and empowered them, on behalf of the

Firm, to take actions to liquidate and dissolve the Firm.  (JA 297.)  Following the meeting, the

Dissolution Committee managed the Firm and began to effectuate a wind-up of the Firm's

business.  (TA 3.)  During this time, all Appellants terminated their employment with the Firm,

either in July or August 2019.[6]  (Opening Brief of Appellants ("App. Brief 1") (ECF No. 10) at

3.)  As of September 1, 2019, LeClairRyan employed none of the Appellants.

---

[4]      For relevant full and excerpted provisions, see *infra* Section IV.B.4–6.

[5]      The Members elected Richard W. "Deke" Bowerman, C. Erik Gustafson, Christopher J.
Lange and Lori D. Thompson to serve as the Dissolution Committee of the Firm.  (JA 297.)  As
of the date of the Chapter 11 petition, only Lori Thompson and Christopher Lange remained on
the Committee.  (TA 3.)

[6]      The termination dates of all appellants in this consolidated appeal follow:  Rodney
Adams — August 31, 2019 (JA 587); Megan Ben'Ary — August 5, 2019 (JA 535); Steven
Blaine — August 9, 2019 (JA 536); James Carroll — July 31, 2019 (JA 537); Andrew Clark —

On September 3, 2019, Lori D. Thompson, as Chair of the Dissolution Committee on

behalf of LeClairRyan PLLC, filed a voluntary petition for relief under Chapter 11 of the

Bankruptcy Code, which allows for reorganization of a bankruptcy estate. (JA 135.) On

September 17, 2019, pursuant to Federal Rule of Bankruptcy Procedure 1007(a)(3), the Debtor-

Firm filed a List of Equity Security Holders. (JA 146.) The ESH List contains the names of

forty-three attorneys, including but not limited to Appellants, who "were the members of

LeClairRyan PLLC as of July 29, 2019, which is the date the members resolved to dissolve the

firm[.]" (JA 146.)

---

August 16, 2019 (JA 590); Brian Donnell — August 29, 2019 (JA 538); Robert Fletcher — August 16, 2019 (JA 543); Robert Harrison — August 14, 2019 (JA 545); William Michael Holm — August 9, 2019 (JA 750); Charles Horn — July 28, 2019 (JA 546); Gretchen Jackson — August 11, 2019 (JA 738); John T. Jessee — August 18, 2019 (JA 588); Ray King — August 14, 2019 (JA 549); Paul Kushnel — August 18, 2019 (JA 589); Joseph Lagrotteria — August 15, 2019 (JA 591); David M. Lay — July 31, 2019 (JA 550); Gary D. LeClair — July 31, 2019 (JA 433); Ilan Markus — August 29, 2019 (JA 554); Christopher Perkins — August 20, 2019 (JA 558); David Phillips — August 23, 2019 (JA 559); Christopher Pizzo — August 21, 2019 (JA 561); Thomas Regan — August 9, 2019 (JA 562); Robin Teskin — August 12, 2019 (JA 737); Peter Van Zandt — August 9, 2019 (JA 563); Robert Wayne — August 28, 2019 (JA 564); Andrew White — July 31, 2019 (JA 573); Diane Wilson — August 29, 2019 (JA 581); and Karen Yates — August 29, 2019 (JA 582).

The Court notes, as did the Bankruptcy Court, that Charles Horn's termination date of July 28, 2019, fell before the dissolution vote occurred. *See* (JA 833 ("I see there is only one person who could argue – and I'm not sure he has argued that he should have been on the list. So I will save that for another day. But that would be Mr. Charles Horn who may have – who terminated his employment on July 28, it appears to me. But I am not making that ruling.") As such, the Court's analysis regarding membership post-dissolution may apply differently to Mr. Horn. However, Mr. Horn joined LeClair's Motion to Amend and filed this appeal jointly with dissimilarly situated individuals, putting forth no arguments as to why he should be treated differently, in this Court or below. Thus, the Court will treat him in the same manner as other Appellants, regardless of his termination date, because the Court will not raise issues *sua sponte* that parties failed to raise. *See Hicks v. Ferreya*, 965 F.3d 302, 310 (4th Cir. 2020) (disagreeing with the defendants that "district courts are obliged to take up [a related] question *sua sponte*, even if the defendants . . . do not raise it[,]" because "[a]s a general rule, 'the parties' litigation conduct' determines what issues are properly before a court").

On October 4, 2019, the Debtor-Firm converted the case to a Chapter 7 liquidation case. (TA 25.)  Since October 4, 2019, the Trustee has served as the Chapter 7 Trustee for the LeClairRyan bankruptcy estate (the "Estate").  (TA 25.)  As of the conversion date, the Trustee became custodian of the Firm's books and records and received authorization to operate certain aspects of the Firm's business to effectuate an orderly liquidation.  (Appellee's/Trustee's Brief ("Tr. Brief") (ECF No. 16) at 4.)  These operations included computation and payment of the Estate's taxes, pursuant to 26 U.S.C. § 1398.  (Tr. Brief at 4.)

## C.     The Trustee's Use of the ESH List

Immediately following her appointment as the Chapter 7 Trustee, the Trustee assumed responsibility for "an IRS audit, a Form 550 filing deadline in 11 days (with no requisite 401(k) plan audit having been completed), a 401(k) plan that had to be otherwise addressed, and relevant books and records that needed to be identified and quickly compiled to address these (among other) items."  (Tr. Brief at 5.)  Additionally, the Trustee received inquiries from former Firm attorneys regarding their Schedule K-1's ("K-1") for 2019.[7]  (Tr. Brief at 5.)  Following discussions with the Office of the United States Trustee and utilizing accounting firms Keiter, Stephens, Hurst, Gary & Shreaves, PC ("Keiter") — LeClairRyan's accountants for its 2018 tax reporting — and Strickland & Co., as well as independent contractors, the Trustee provided

---

[7]      The Internal Revenue Service explains that:

> The partnership uses Schedule K-1 to report [a] share of the partnership's income, deductions, credits, etc. . . . The partnership files a copy of Schedule K-1 (Form 1065) with the IRS. . . . Although the partnership generally isn't subject to income tax, you may be liable for tax on your share of the partnership income, whether or not distributed.

Dept. of Treasury, Internal Revenue Serv., Schedule K-1 (Form 1065): General Instructions: Purpose of Schedule K-1 (2021).

Keiter with the ESH List to file the Estate's tax returns. (Tr. Brief at 3, 5, 10). In July of 2019, former attorneys of LeClairRyan received their K-1's and in June 2020, the Trustee filed the 2019 tax returns.[8] (Tr. Brief at 10.) Questions regarding the filed K-1's immediately poured in. (Tr. Brief at 11.)

In 2020, the Trustee used the same filing process, with K-1's filed based off of the ESH List, albeit using Strickland & Co. to assist with the preparation of the tax returns. (Tr. Brief at 12.) In connection with the Estate's tax returns for 2019 and 2020, the Trustee continued to receive questions regarding the K-1's, including a request to "clarify . . . that [LeClairRyan] ceased being a tax flow through taxpayer on the day that the last member's employment was terminated." (Tr. Brief at 14.) When informed about the "inaccura[cy]" of the ESH List, the Trustee could not ascertain the correctness of the assertions based on the Firm's books and records. (Tr. Brief at 15.)

**D.    Motion to Amend and Motion to Authorize**

Due to the confusion regarding the K-1's and use of the ESH List, the Trustee sought an order from the Bankruptcy Court authorizing her continued reliance on the List. (JA 152.) On November 2, 2021, the Trustee filed the Trustee's Motion to Authorize. (JA 152.) The Motion sought "an order approving the Trustee's" "continued reliance on Debtor's List of Equity Security Holders." (JA 163–64.) The Motion argued that "the Trustee has no legal ability or duty to either (a) alter the ESH List through a 'clarification' or (b) pay the tax obligations of those on the ESH List. Thus, the Trustee should be able to continue to rely on the ESH List." (JA 163.)

---

[8]    The Trustee notes that she finalized and filed the returns "to facilitate members' receipt of K-1's that they were so desperately seeking given her understanding that, if needed, the returns could be amended for up to three years after filing." (Tr. Brief at 10–11.)

On November 12, 2021, certain Appellants filed objections to the Motion. (JA 304.) On February 14, 2022, LeClair filed a Motion to Amend, seeking removal of his name from the ESH List, pursuant to Bankruptcy Rule 1009(a). (JA 410.) On March 4, March 7, and March 24, 2022, former Firm attorneys filed Joinder Motions, seeking to join LeClair's Motion to Amend. (JA 533, 583, 735.)

### E.     March 29, 2022 Hearing

On March 29, 2022, United States Bankruptcy Judge Kevin R. Huennekens conducted a hearing regarding, among other motions, the Trustee's Motion to Authorize, LeClair's Motion to Amend and the Joinder Motions. (JA 760–61.) After hearing argument on the Motion to Authorize and the Motion to Amend,[9] Judge Huennekens issued rulings from the bench, beginning with the statement that the court "does not, in its rulings today, intend to make any tax rulings." (JA 831.) The Bankruptcy Court then ruled that the Firm effectively dissolved on July 29, 2019, the critical date for who constitutes an equity security holder and belongs on the List. (JA 831.) Lastly, the Bankruptcy Court held that "the trustee may rely on th[e ESH] list." (JA 833.)

### F.     The Bankruptcy Court's Orders

On April 21, 2022, the Bankruptcy Court issued an Order denying LeClair's Motion to Amend and denying the Joinder Motions "to the extent they are requests for relief." (JA 862–63.) In the Memorandum Opinion filed contemporaneously with the Order, the Bankruptcy Court framed the issue presented as "a discrete one," specifically the court framed the issue as:

---

[9]     The joining Members' attorneys appeared at the hearing, but did not present evidence in support of the Motion to Amend, only offering support of their Joinder Motions. (JA 854.)

> [S]hould the Trustee be ordered to amend the list of equity security holders for a now-defunct law firm devoid of lawyers in order to remove Mr. LeClair and Former Attorneys as equity security holders?  In answering this narrow question, the Court makes no finding as to the taxable consequences of being included on the ESH List.[10]

(JA 855.)

The Bankruptcy Court then turned to an analysis of the Firm's Operating Agreement and

Dissolution Resolution, holding that the Members "voted to dissolve and liquidate the Debtor in

accordance with" the Operating Agreement and that the dissolution was effective as of July 29,

2019.  (JA 856–57.)  The court further held that Membership terminated as of the termination of

employment with the Firm, but that LeClair did not terminate his employment until July 31,

2019, after the Dissolution Resolution.  (JA 857.)  As such, his termination of Membership "was

null and void."  (JA 858.)  The court then held that through LeClair's termination email and

subsequent involvement in the bankruptcy case, LeClair ratified the Firm's dissolution.  (JA

859–60.)  In so holding, the Bankruptcy Court denied the Motion to Amend, finding that all

---

[10]     Footnote 3 of the opinion continues:

> Bankruptcy taxation is a nuanced area of the law.  Generally, the filing of a bankruptcy petition by an individual under Chapter 7 or 11 of the Bankruptcy Code creates a separate taxable entity.  26 U.S.C. § 1398.  No separate taxable entity is created when a corporation or partnership files a bankruptcy case.  *Id.* § 1399; *see also id.* § 1398(b)(2).  No doubt, the responsibility for preparing and filing the tax returns for the bankruptcy estate fall on the Chapter 7 trustee.  *See id.* § 1398(c)(1).  In the case of a partnership or other tax flow-through entity, it is possible for the income generated by the bankruptcy estate to pass through to the partners' level with a corresponding lack of cash flow necessary to pay the taxes.  *See id.* § 702.  The Debtor in the case at bar was a flow-through taxpayer prior to the Petition Date, and, as such, may continue to be a flow-through taxpayer post-Petition Date.  *See, e.g.*, *Williams v. Comm'r*, 123 T.C. 144, 149 (2004).  Given the limited relief sought by the Motion, those complicated tax issues are not presently before the Court.

(JA 855.)

former attorneys, including LeClair, were Members as of the dissolution date and thus should remain on the ESH List. (JA 863–64.)

On April 28, 2022, the Bankruptcy Court issued its Corrected Order Approving the Trustee's Reliance on Debtor's List of Equity Security Holders. (JA 865.) The Bankruptcy Court ruled on the Trustee's Motion to Authorize, seeking approval of the Trustee's "continued reliance on Debtor's ESH List," and on the Objections to the Trustee's Motion to Approve.[11] (JA 865–66.) Having reviewed the Motion and the Objections and the evidence presented during the March 29, 2022 hearing, the Bankruptcy Court determined that the Objections "have either been withdrawn or are hereby overruled based on (1) the statement found at footnote 1 of [LeClair's Motion to Amend] that 'he does not object to the Trustee's reliance on an accurate ESH List,'" (2) the Joinder Motions, (3) the fact that unreliability formed the "primary basis" for the Objections, and (4) that the evidence in the Trustee's Declarations dated March 28, 2022, and November 15, 2021 "establish just cause for relief herein granted[.]" (JA 866–67.)

The Trustee's Declaration from November 15, 2021, laid out the factual background of the Firm's dissolution and liquidation, and her preliminary and continued usage of the ESH List

---

[11]     The Objections included the following motions:  Objection to Trustee's Motion to Approve filed on behalf of Gary D. LeClair; Rodney K. Adams, John T. Jessee, Paul C. Kuhnel, and Andrew K. Clark's Limited Objection to Trustee's Motion for an Order Approving (I) The Trustee's Reliance on Debtor's List of Equity Security Holders and (II) Procedures for Obtaining Copies of Filed Tax Returns and Memorandum in Support Thereof; Objection to Trustees Motion for an Order Approving (I) The Trustees Reliance on Debtor's List of Equity Security Holders and (II) Procedures for Obtaining Copies of Filed Tax Returns filed on behalf of Elizabeth Acee; Objection to Trustees' Motion for an Order Approving (I) The Trustee's Reliance on Debtor's List of Equity Security Holders and (II) Procedures for Obtaining Copies of Filed Tax Returns filed on behalf of Richard W. Bowerman, Paul Burleigh, Karol Corbin Walker, Mark Dombroff, Niclas Ferland, Janice Grubin, Charles Erik Gustafson, Christopher J. Lange, Jason Medley, Lori Thompson; and, Objection Joinder to Various Objections filed by Christopher J. Perkins on behalf of Certain Former Attorneys (collectively, "Objections," and each an "Objection").

for taxation purposes. (TA 102.) The March 28, 2022 Declaration explained that the Trustee, in

an attempt to resolve the objections with the objectors, "confirmed that the real issue to be

addressed was whether certain individuals should be relieved of his/her tax obligations of the

professional limited liability company." (JA 751.) Furthermore, the Trustee contrasted the

"specific request" of removal from the List with "the ultimate outcome desired":

> [T]he amendment of the [Firm]'s 2019 and 2020 tax returns such that (a) the
> Estate will cease issuing K-1s to said individuals and (b) those individuals will no
> longer share in the tax benefits, or more importantly, tax obligations of the
> professional limited liability company from 2019 forward. The crux . . . is the
> termination of tax obligations[.]

(JA 752.) The Trustee emphasized that members of the Firm as of July 29, 2019 "remain equity

security holders for tax and other economic purposes until such time as the Company as been

dissolved and completely wound-up[.]" (JA 752.) She reiterated that the Firm did not take the

necessary steps to cease LeClairRyan from operating as a pass-through taxpayer before the

Petition Date, and that she lacked the authority to change the Firm's tax status. (JA 757.) Thus,

any modification "should not result in the equivalent of changing the [Firm]'s tax status" and, so

long as the status does not change, the Trustee did not "per se object to the relief sought[.]" (JA

757.) Based upon this evidence, the Bankruptcy Court granted the Trustee's Motion to

Authorize:

> The Trustee, directly and/or through her professionals, is authorized to continue to
> rely on the Debtor's ESH List in its current form until and if said ESH List is
> altered by further Order of this Court (the "Revised ESH List"). To the extent
> there is any Revised ESH List, the Trustee, directly and/or through her
> professionals, is authorized to rely on the Revised ESH List.

(JA 867 (cleaned up).)   Appellants, themselves attorneys on the ESH List, now appeal these

decisions.

## II.   PROCEDURAL HISTORY

On April 12 and April 26, 2022, Appellants filed timely notices of appeal from the

Bankruptcy Court's final Orders.[12]  (JA 877, 886.)  In their appeals, Appellants argue that the

Bankruptcy Court erred in denying the Appellants' Motion to Amend and granting the Trustee's

Motion to Authorize based on the Bankruptcy Court's interpretations of (1) the Dissolution

Resolution, (2) the Operating Agreement, (3) Gary D. LeClair's resignation email, and (4)

subsequent ratification of the dissolution.  (App. Brief 1 at 1–2; Opening Brief of Appellants

("App. Brief 2") (ECF No. 10) at 1–2.)  Appellants further argue that the Bankruptcy Court's

approval of the Motion to Authorize was an improper advisory opinion and, even assuming that

there was a case or controversy, the Bankruptcy Court lacked jurisdiction to decide the issue.

(App. Brief 1 at 1–2; App. Brief 2 at 1–2.)[13]

On June 22, 2022, after consolidation of the appeals, Appellants filed both Opening

Briefs of Appellants, appealing the Bankruptcy Court's denial of the Motion to Amend and

granting of the Motion to Authorize.  (ECF Nos. 10, 11.)  Appellants also filed a Consolidated

Joint Appendix in eight parts.  (ECF Nos. 12, 13, 14.)  On July 22, 2022, the Trustee filed her

response entitled Appellee/Trustee's Brief.  (ECF No. 16.)  In response to Appellants' Opening

Briefs, the Trustee argues that (1) the Bankruptcy Court properly interpreted the above

---

[12]     "Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete
disputes within the overarching bankruptcy case." *Ritzen Grp., Inc. v. Jackson Masonry, LLC*,
140 S. Ct. 582, 586 (2020) (citing *Bullard v. Blue Hills Bank*, 575 U.S. 496, 501 (2015)).  As the
Bankruptcy Court ruled on the Appellants' Motion to Amend and the Trustee's Motion for
Authorization, definitely disposing of the dispute over the ESH List at the Bankruptcy Court
level, "the Bankruptcy Court's order conclusively denying that motion is 'final,'" and thus
"immediately appealable." *Id.* at 592.  Therefore, the matters are ripe for review by this Court.

[13]     The two groups of Appellants filed separate briefs but incorporate, in their entireties, the
argument sections of the others' brief.  As such, the Court will treat the Appellants' arguments as
a cohesive whole, referring to the two briefs' arguments together as "Appellants' argument," or
iterations of the same.

documents, (2) the Court should deny the Motion to Amend on the basis of *res judicata*, and (3) the Bankruptcy Court did not issue an advisory opinion.  The Trustee also submitted Appellee/Trustee's Appendix in three parts.  (ECF No. 17.)  On August 5, 2022, Appellants filed their reply briefs, rendering the matters ripe for review.  (ECF Nos. 19, 20.)

### III.    STANDARD OF REVIEW

"When reviewing a decision of the bankruptcy court [rendered in a core proceeding],[14] a district court functions as an appellate court and applies the standards of review generally applied in federal courts of appeal." *Paramount Home Ent. Inc. v. Cir. City Stores, Inc.*, 445 B.R. 521, 526–27 (E.D. Va. 2010) (citing *In re Webb*, 954 F.2d 1102, 1103–04 (5th Cir. 1992)). Specifically, "[t]he district court reviews the bankruptcy court's legal conclusions *de novo* and its factual findings for clear error." *Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. US, LLC*, 578 B.R. 325, 328 (E.D. Va. 2017) (citing *In re Harford Sands Inc.*, 372 F.3d 637, 639 (4th Cir. 2004)).  Clear error exists when the district court "'is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)).  In cases involving mixed questions of law and fact, "the [c]ourt reviews findings of fact under the clearly erroneous standard and reviews *de novo* the legal conclusions derived from those facts." *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 662 (E.D. Va. 2022) (citing *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*,

---

[14]    The parties do not contest the claims' status as core proceedings. (App. Brief 1 at 1; App. Brief 2 at 1.) The Bankruptcy Court also found that these were core proceedings. (JA 855 ("This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).").) As the Motion to Amend and the Motion to Authorize "stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance process," the claims arising out of these motions are "core proceedings" and the Bankruptcy Court had authority to enter a judgment on the Motions. *Stern v. Marshall*, 564 U.S. 462, 471, 499 (2011) (holding that bankruptcy courts have jurisdiction to issue final judgments regarding core proceedings).

*Charlotte Branch*, 80 F.3d 895, 905 (4th Cir. 1996)).  A district court reviews a bankruptcy

court's use of its equitable powers for abuse of discretion.  *ReGen Cap. I, Inc. v. Halperin (In re*

*U.S. Wireless Data, Inc.)*, 547 F.3d 484, 492 (2d Cir. 2008); *Litty v. Litty (In re Litty)*, 1998 WL

398737, at *2 (4th Cir. July 8, 1998).  Finally, on appeal, a court must consider whether the court

below exceeded its constitutional or statutory authority.  A court on appeal reviews questions of

jurisdiction *de novo*. *Tillman v. Resolution Trust Corp.*, 37 F.3d 1032, 1034 (4th Cir. 1994).

### IV.    ANALYSIS

Appellants argue (1) that the Bankruptcy Court erred in denying Appellants' Motion to

Amend and granting the Trustee's Motion to Authorize based on the Bankruptcy Court's

interpretations of (i) the Dissolution Resolution, (ii) the Operating Agreement, (iii) Gary D.

LeClair's resignation email and (iv) subsequent ratification of the dissolution, and (2) that the

Bankruptcy Court's approval of the Motion to Authorize constituted an improper advisory

opinion.  In response, the Trustee argues (1) that the Bankruptcy Court properly interpretated the

above documents, (2) that the Court should deny the Motion to Amend on the basis of *res*

*judicata* and (3) that the Bankruptcy Court did not issue an advisory opinion.

This appeal requires that the Court first determine whether the Bankruptcy Court

exceeded its authority under the Constitution when it granted the Trustee's Motion to Authorize.

This analysis will encompass the role of the Trustee in a bankruptcy proceeding, the functions of

an ESH List, and whether the Bankruptcy Court issued an advisory opinion by granting the

Motion.  In so determining that the Bankruptcy Court correctly granted, in part, the Trustee's

Motion to Authorize, the Court will then address the Motion to Amend.

The Court begins its analysis of the Bankruptcy Court's denial of the Motion to Amend

by interpreting the Operating Agreement to determine the following issues:  (1) whether the

Members adopted the Dissolution Resolution pursuant to the Operating Agreement, (2) the Dissolution Resolution's Effective Date, and (3) whether Members could withdraw their membership following the Effective Date of dissolution. After so determining Membership, the Court then considers which date the ESH List should use to determine whether amendment is necessary.

### A.    Motion to Authorize

The Court first turns to whether the Bankruptcy Court erred by granting the Trustee's Motion to Authorize, permitting continued use of the ESH List by the Trustee in the bankruptcy proceeding. First, to note, the tax issue of List membership constitutes merely a collateral consequence of the Court's ruling. The Bankruptcy Court made no tax ruling, and explicitly said so.[15] Likewise, this Court does not consider the taxation consequences in its review of the Bankruptcy Court's decisions. Second, the Trustee has a responsibility to bring disputes that affect the estate to the Bankruptcy Court when these issues arise. While the Trustee has a role and responsibility to do so, LeClair and the Former Attorneys also sought this amendment or authorization. Thus, third, the Bankruptcy Court's ruling does not constitute an advisory opinion as all three parties brought their dispute over the ESH List — which was required in the Chapter 11 proceeding — for the court's resolution, after Appellants repeatedly tried unsuccessfully to amend the ESH List via the Trustee. However, as explained below, the Court finds that a portion of the Bankruptcy Court's order authorizing prospective use of a hypothetical Revised List was advisory and therefore improper.

---

[15]    *See, e.g.*, *supra* note 10.

1.     **The Trustee takes an active role in bankruptcy proceedings.**

In a Chapter 7 bankruptcy proceeding, a Liquidating Trustee's main duty is to "collect and reduce to money the property of the estate . . . and close such estate as expeditiously as is compatible with the best interests of the parties in interest[.]" 11 U.S.C. § 704(a)(1).  In so doing, a Trustee also takes responsibility "for collection or determination of any tax arising out of such operation[.]" *Id.* § 704(a)(8).  In addition to the other enumerated duties in § 704, a Trustee must administer the estate generally. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) ("As even this brief and incomplete list should indicate, the Bankruptcy Code gives the trustee wide-ranging management authority over the debtor."). This duty includes raising any issues with the estate or its administration with the United States Trustee or the Bankruptcy Court. *Cf. In re Freelander Inc., The Mortg. People*, 95 B.R. 390, 395 (Bankr. E.D. Va. 1989) ("[I]f the Trustee wishes input in making his decision, he could notice all creditors of his intent to [act].  If any party objects, a hearing in th[e Bankruptcy] Court can be conducted, and all interested parties may attend and be heard.").

Thus, seeking authorization to proceed with the use of the ESH List with regard to the Trustee's responsibility to collect and determine taxes, and the subsequent objections and hearing on said motion, fall into the broad statutory and equitable powers of a Chapter 7 Trustee.

2.     **An ESH List is used in Chapter 11 and Chapter 7 bankruptcy proceedings.**

Arising under Fed. R. Bankr. P. 1007(a)(3), an equity security holder list constitutes one of the "Lists, Schedules, Statements, and Other Documents" filed at the commencement of a bankruptcy proceeding under Chapter 11:

> In a chapter 11 reorganization case, unless the court orders otherwise, the debtor shall file within 14 days after entry of the order for relief a list of the debtor's equity security holders of each class showing the number and kind of interests registered in the name of each holder, and the last known address or place of business of each holder.

Fed. R. Bankr. P. 1007(a)(3) (titled "Equity Security Holders"). The rule ensures that debtors provide notice to equity security holders of the petition's filing and potential equity security holders' meeting, if the Trustee so desires to hold one. Fed. R. Bankr. P. 2002(d) (requiring notice to equity security holders); 11 U.S.C. § 341(b) (meeting of equity security holders). "Notice to creditors and other parties in interest is essential to the operation of the bankruptcy system. Sending notice requires a convenient listing of the names and addresses of the entities to whom notice must be sent." Fed. R. Bankr. P. 1007(a) Adv. Comm.'s n. to 2005 enactment. The ESH List's purpose mirrors that of the list of creditors required under Rule 1007(a). *Cf.* Fed. R. Bankr. P. 1007(a) Adv. Comm.'s n. to 1983 enactment ("[The creditor] list is needed for notice of the meeting of creditors [ ] and notice of the order for relief[.]").

Additionally, "[t]he list of equity security holders filed pursuant to Rule 1007(a)(3) shall constitute prima facie evidence of the validity and amount of the equity security interests and it shall not be necessary for the holders of such interests to file a proof of interest." Fed. R. Bankr. P. 3003(b)(2) ("List of equity security holders"). It may also help determine a "party in interest." *See* 11 U.S.C. § 101(14)(A) (defining "disinterested person" to include a non-equity-security holder); *Id.* § 1109(b) (defining a "party in interest" under Chapter 11 to include an equity security holder). Thus, in addition to providing notice, the ESH List can establish an equity holder's interest, without need for additional filings by interest holders, such that if there remains any equity to distribute from the estate, the Trustee knows to whom to distribute.

In addition to its use in a Chapter 11 reorganization proceeding, the ESH List can find its way into a Chapter 7 liquidation proceeding:  "When a chapter 11 case . . . has been converted or reconverted to a chapter 7 case, . . . [l]ists, inventories, schedules, and statements of financial affairs theretofore filed shall be deemed to be filed in the chapter 7 case, unless the court directs otherwise."  Fed. R. Bankr. P. 1019(1)(A).  This eliminates the need for duplicative filings and compilations as when "requirements applicable in the superseded case respecting the filing of schedules . . . have been complied with before the order directing conversion to liquidation, these documents will ordinarily provide all the information about the debts, property, financial affairs, and contracts of the debtor needed for the administration of the estate."  Fed. R. Bankr. P. 1019(1) Ad. Comm.'s n. to the 1983 enactment.  Without conversion, a Debtor would not originally file an ESH List in a Chapter 7 liquidation proceeding.

Here, as the bankruptcy case was converted from a Chapter 11 to a Chapter 7 proceeding on October 4, 2019, the ESH List properly made its way into this proceeding.  Thus, the Trustee could use this List in the current proceeding.[16]

### 3.    The Bankruptcy Court issued too broad of an Order.

Despite the proper usage of the ESH List in the bankruptcy proceeding, the Court finds that the Bankruptcy Court issued too broad of an Order authorizing its use, as an aspect of the Order became advisory in nature.

"[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions."  *Flast v. Cohen*, 392 U.S. 83, 96 (1968) (quotations and citations omitted).  As federal courts, bankruptcy courts must heed this

---

[16]    Even when contesting the List's usage in its current form, Appellants conceded that the List can be used by the Trustee in a Chapter 7 proceeding. *See, e.g.*, (JA 866 (quoting LeClair's Motion to Amend that he "does not object to the Trustee's reliance on an accurate ESH List").)

limitation. "Bankruptcy courts, like other federal courts, are constitutionally limited to deciding 'cases and controversies' and may not render advisory opinions." *In re Avellaneda*, 2009 WL 5066667, at *2 (Bankr. E.D. Va. Dec. 16, 2009) (citing *North Carolina v. Rice,* 404 U.S. 244, 246 (1971)). An advisory opinion arises when no case or controversy exists and "given the lack of an actual dispute, the[e] suit is not justiciable." *Shenandoah Valley Network v. Capka*, 669 F.3d 194, 201 (4th Cir. 2012).

Here, the Bankruptcy Court's rulings decided a "case [or] controversy," as the Trustee and former attorneys brought their dispute over the ESH List to the Bankruptcy Court for resolution, after Appellants repeatedly tried (and failed) to convince the Trustee to amend the ESH List. The parties briefed the Motions and the Bankruptcy Court heard argument on them before issuing rulings from the bench and via memorandum opinion and order. Thus,

> [t]he [Bankruptcy] Court's rulings upon hypothetical objections . . . would differ fundamentally from the order presently being sought by the Trustee. At the core of this distinction is the fact that in the case of an objection to a proposed action, the Court would have before it two or more adverse parties who would be asking the Court to apply neutral principles to settle a controversy between them.

*In re Freedlander Inc.*, 95 B.R. at 395.

Similarly, courts cannot issue opinions that lack a concrete question presented or opine on future issues not before the court. Courts "must wait until the case has 'taken on fixed and final shape so that [a court] can see what legal issues [it] is deciding, [and] what effect its decision will have on the adversaries.'" *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 200 (4th Cir. 2019) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952)); *see also Gilles v. Torgersen,* 71 F.3d 497, 500 (4th Cir. 1995) ("Courts, however, must not deal in abstractions, for courts can only adjudicate actual cases, involving issues that are precisely framed by their connection to specific litigants in a concrete context."). "Thus, even if [a]

20

decision on the merits could assist [the parties] in some future litigation, such a decision would be exactly the sort of advisory opinion prohibited by Article III." *Yunker v. Allianceone Receivables Mgmt., Inc.*, 701 F.3d 369, 374 (11th Cir. 2012) (citing *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 12 (1992)); *BankWest, Inc. v. Baker*, 446 F.3d 1358, 1368 (11th Cir. 2006) ("If we addressed issues that might arise, we would be rendering an advisory opinion on future conduct and events that may never occur, something which Article III does not permit us to do.").

Here, although properly addressing the issue, the Bankruptcy Court went too far in its ruling, venturing into advisory opinion territory by issuing a broad authorization of the Trustee's continued reliance on the ESH List: "The Trustee . . . is authorized to continue to rely on the Debtor's ESH List in its current form and . . . [t]o the extent there is any Revised ESH List, the Trustee . . . is authorized to rely on the Revised ESH List." (JA 867.) The language of the Order allowed the Bankruptcy Court to rule on a universe of issues, both those presented to the Bankruptcy Court and ones not before it. The prospective nature of the Order involving an unknown Revised ESH list results in the Bankruptcy Court granting permission to the Trustee for future uses without the Trustee bringing the specific issue before the Bankruptcy Court as a concrete, justiciable issue. The Bankruptcy Court's reasoning for authorization addressed solely its findings on the reliability and accuracy of the current ESH List, following the Bankruptcy Court's denial of the Appellant's Motion to Amend. (JA 866–67.) In doing so, the Bankruptcy Court properly acted in regard to the current ESH list. However, the Bankruptcy Court did not address the accuracy of a future or revised list, nor could it, as no such list existed at the time. Additionally, the Bankruptcy Court did not determine if it had the power to issue an authorization of continued reliance on any Revised ESH List for seemingly any and all purposes,

forever and always.  Thus, through this breadth, the Bankruptcy Court issued a partially

unconstitutional opinion and that aspect of the Order must be stricken on remand.  *See*

*BankWest, Inc.*, 446 F.3d at 1367 (holding that the court would be "'overstepping [its] judicial

authority' by rendering an 'impermissible advisory opinion about a non-existing' set of facts").[17]

As such, the Court AFFIRMS IN PART the Bankruptcy Court's Order on the Motion to

Authorize to the extent that it allows the Trustee to continue to rely on the Debtor's *current* ESH

List.  The Court REVERSES IN PART the Bankruptcy Court's Order to the extent that it

authorizes the Trustee to rely on any revised or future ESH List.  *See United States v. Fruehauf*,

365 U.S. 146, 157 (1961) (refusing to give an opinion on "such advance expressions of legal

judgment upon issues which remain unfocused because they are not pressed before the Court

with that clear concreteness provided when a question emerges precisely framed and necessary

for decision . . .").  In doing so, the Court remands to the Bankruptcy Court with instructions to

strike the following language from its Order:  "To the extent there is any Revised ESH List, the

Trustee, directly and/or through her professionals, is authorized to rely on the Revised ESH

List."  (JA 867).

To be clear, the Court's partial affirmance of the Bankruptcy Court's Order should not be

construed as ruling on the taxable consequences of the decision.  The Bankruptcy Court did not

purport to rule on taxation issues in the Motion to Authorize or its companion Order on the

Motion to Amend, *see* (JA 855 ("[T]hose complicated tax issues are not presently before the

Court.")), nor did the Bankruptcy Court have jurisdiction to do so.  *See United States v. Spector*

*(In re Booth Tow Servs., Inc.)*, 53 B.R. 1014, 1018 (W.D. Mo. 1985) ("While the grant of

---

[17]     Of course, if the need for a Revised ESH List arises in the future, the Trustee may return
to the Bankruptcy Court to address the propriety of the revision.

jurisdiction to bankruptcy courts in Chapter 11 actions is a broad one, [the court] do[es] not believe it can reasonably be extended to determining a non-debtor's *personal* tax liability.") (emphasis in original). As such, these taxation consequences remain inconsequential to the Court's decision. With this in mind, the Court now turns to the Bankruptcy Court's companion Order regarding the Motion to Amend.

### B.   Motion to Amend[18]

The Bankruptcy Court's denial of the Motion to Amend goes hand-in-hand with its grant of the Trustee's Motion to Authorize. (JA 867 (citing "this Court's findings in the [Motion to Amend] Memorandum Opinion entered April 21, 2022" as a reason for granting the Motion to Authorize).) If the Bankruptcy Court had denied the Motion to Authorize, Appellants would lack necessity to amend the ESH List. However, now that the Court has determined that the Trustee can continue to rely on the current ESH List in the Chapter 7 proceeding, the Court turns to Appellants' Motion to Amend. The Bankruptcy Court found that "the issue presently before the Court is a discrete one:  should the Trustee be ordered to amend the list of equity security holders for a now-defunct law firm devoid of lawyers in order to remove Mr. LeClair and the Former Attorneys as equity security holders?" (JA 855.) The Bankruptcy Court answered in the negative and this Court agrees.

### 1.   The Bankruptcy Court may liberally amend lists, if there exists a lawful basis to do so.

In a bankruptcy proceeding, under Fed. R. Bankr. P. 1009(a), "[o]n motion of a party in interest, after notice and a hearing, the court may order any voluntary petition, list, schedule, or statement to be amended." (titled "General Right to Amend"). This rule applies to Rule 1007(a)

---

[18]   The Court deals simultaneously here with the Motions for Joinder, finding them part and parcel of the Motion to Amend. As such, the Motions stand or fall as one.

lists, including the equity security holder list. LeClair's Motion to Amend, and the former

attorney's Joinder Motions, thus properly motioned the Bankruptcy Court to amend the list. The

Bankruptcy Court also had jurisdiction to provide the sought-after relief under Rule 1009(a).

Under Bankruptcy Rule 1009(a), the standard for amending schedules or lists, like the

ESH List, is liberally granted. "Bankruptcy Rule 1009(a) allows a debtor to amend a voluntary

petition, schedules, or statement as a matter of course at any time before the case is closed." *In

re Dunn*, 2010 WL 2721201, at *2 (Bankr. E.D.N.C. July 7, 2010) (citing Fed. R. Bankr. P.

1009(a)); *see also In re Sheridan*, 38 B.R. 52, 54 (Bankr. D. Ver. Dec. 30, 1983) ("A debtor does

not need court permission to amend any of his schedules so long as the case is still open.

Bankruptcy Rule 1009 by its terms permits amendments 'as a matter of course.'") (citations

omitted). While parties in interest must motion the bankruptcy court for an order to amend a list

or schedule, bankruptcy courts liberally grant these motions. *See In re Main St. Tours, Inc.*, 2021

Bankr. LEXIS 1581, at *3–4 (Bankr. N.D. Ohio June 3, 2021) (granting motion to amend

schedules to add new creditors). This discretion remains with the Bankruptcy Court. *Cf. In re

Gershenbaum*, 598 F.2d 779, 782 (3d Cir. 1979) (holding that Rule 1009(a)'s predecessor Rule

allows amendments by persons other than the debtor "subject to the discretion of the bankruptcy

court"). However, where no proper legal basis exists, amendment should not occur: the Rule

"'places the duty on the referee[, the Court,] to cause incomplete and defective schedules to be

amended.'" *Id.* at 782 n.7 (quoting 12 Collier on Bankruptcy ¶ 110.02 (15th ed. 1979)). Thus,

the Bankruptcy Court possesses the discretion under Rule 1009(a) to grant or deny amendment

of a list. Here, the Bankruptcy Court found no legal reason to order amendment. In determining

whether the Bankruptcy Court correctly declined to amend the ESH List, the Court now turns to

the accuracy of the current List.

### 2.   LeClairRyan's Operating Agreement controls.

Under the Virginia Limited Liability Company Act, a LLC "is bound by its operating agreement, which regulates the conduct of its business and the relations of its members." *Belle v. Shaia (In re Nedrick)*, 2017 WL 1207507, at *4 (Bankr. E.D. Va. Mar. 31, 2017) (citing Va. Code Ann. § 13.1-1023(A)(1)).  As such, LeClairRyan's Operating Agreement controls this dispute.

In reviewing the Operating Agreement *de novo*, the Court applies general rules of contract interpretation under Virginia law.[19]  *TM Delmarva Power, LLC v. NCP of Va., LLC*, 263 Va. 116, 119 (2002); *Foothill Cap. Corp. v. E. Coast Bldg. Supply Corp.*, 259 B.R. 840, 844 (E.D. Va. 2001).  Courts should construe contract terms according to their plain meaning. *Bridgestone/Firestone, Inc. v. Prince William Square Assocs.*, 250 Va. 402, 407 (1995).  As such, a "contractual term, absent a definition in the contract, is construed according to its usual, ordinary, and popular meaning." *Palmer & Palmer Co. v. Waterfront Marine Constr., Inc.*, 276 Va. 285, 290 (2008).  Furthermore, "[a] contract is not ambiguous merely because the parties disagree as to the meaning of the terms used." *TM Delmarva Power, LLC*, 263 Va. at 119. Additionally, courts must consider contracts as a whole "without giving emphasis to isolated terms." *Am. Spirit Ins. Co. v. Owens,* 261 Va. 270, 275 (2001).  And "no word or clause in a contract will be treated as meaningless if a reasonable meaning can be given to it, and parties are presumed not to have included needless words in the contract." *TM Delmarva Power*, 263 Va. at 119 (citing *D.C. McClain, Inc. v. Arlington Cnty.,* 249 Va. 131, 135–36 (1995)).

---

[19]    The parties agree that Virginia law applies to the interpretation of the Operating Agreement.

In deciding whether the Bankruptcy Court erred in denying amendment of the ESH List, the Court must first determine whether adoption of the Dissolution Resolution validly occurred and, if so, whether Appellants remained Members of LeClairRyan following adoption of the Dissolution Resolution.  Once the Court determines the Firm's Membership on July 29, 2019, the Court must turn to whether the Trustee correctly dated the ESH List.  The Court finds that the Firm correctly adopted the Dissolution Resolution pursuant to the Operating Agreement and that Appellants remained Members of the firm following the July 29, 2019 dissolution.  The Court additionally finds that the ESH List should be dated as of the Petition Date of the Chapter 11 bankruptcy filing — not the dissolution date of the Firm — but, regardless, the List's Membership does not change between the two dates.  Therefore, Appellants correctly remain on the List and the Court affirms the Bankruptcy Court's denial of Appellants' efforts to amend the List.

### 3.    The Dissolution Resolution's adoption conformed to the Operating Agreement.

The Court first addresses whether the Members of LeClairRyan validly adopted the July 29, 2019 Dissolution Resolution.  Appellants contend that, since LeClair did not participate in the affirmative vote nor give written consent to the dissolution, the vote did not conform to the requirements of the Operating Agreement.  The Bankruptcy Court disagreed with Appellants, finding that LeClair did not vote, but that he gave later written ratification of the decision in his resignation email to the Firm's CEO.  (JA 860.)  The Court agrees with the Bankruptcy Court's outcome, finding that the Members properly conducted the vote pursuant to the Operating Agreement.  However, the Court declines to address whether or not LeClair ratified the action, as the Operating Agreement required neither his vote nor consent to adopt the resolution.

26

The LeClairRyan Operating Agreement controls the dispute regarding the validity of the Dissolution Resolution. The Operating Agreement provides that a "special meeting of the Members for any purpose or purposes may be called by the Chief Executive Officer or a majority of the Board or by Members together holding a majority of the outstanding Common shares or . . . Preferred shares entitled to vote at the meeting." Op. Agmt. § 9.08(d). Section 9.08(f) further defines the parameters of a meeting, requiring a quorum for a vote to be taken and "[i]f less than a quorum shall be attendance . . . the meeting may be adjourned . . . by holders of a majority of the Shares entitled to vote and [sic] respect to the business to be transacted, who shall be in attendance . . . ." Appellants do not contend that the meeting lacked a quorum, despite LeClair's absence, because a quorum is defined as a majority of shareholders entitled to vote, and LeClair lost his entitlement when he provided his notice of termination.

LeClair's loss of his voting rights resulted from Section 9.08(g) of the Operating Agreement, which provides that "[a]t any meeting of the Members, each Member in attendance of a Class or Shares entitled to vote on any matter coming before the meeting shall, as to such matter, have (i) one vote for each Common Share . . . one vote for each Preferred Share standing in his or her name on the books of the Company, in each case on such date . . . ." *Id.* § 9.08(g). However, the next provision limits this entitlement drastically, as Members who hold shares on the date of the vote cannot vote "provided, however, if notice of termination of a Member's employment with the Company has been given by the Member or the Company prior to the date of such meeting . . . ." *Id.* § 9.08(g). The noticing Member is thus not included in either (a) determining a quorum's presence or (b) the vote at such a meeting. *Id.* Therefore, despite still

retaining Membership interests[20] between the notice and the effective date of termination, the terminating Member shall not vote nor participate in such meetings.

Other provisions lend further support to the removal of the right of a Member to vote following notice of termination. As mentioned above, Sections 9.08(d) and (f) defining a meeting and a quorum both look only to "Members entitled to vote" at such a meeting, not all Members, suggesting that there are Members who exist but who lack a right to vote or participate in such meetings. Additionally, Section 2.02(h) "Reasonableness of Notice Period" states that "[d]uring the Notice Period,[21] the Company shall not alter, directly or indirectly, any of the rights or privileges of such Member (*other than the right to vote* as Member, Director, or Manager as set forth in the Bylaws or this Agreement) . . . ." (emphasis added).

Together, these provisions, along with Section 9.08(g), demonstrate that once the Firm received notice from a Member, that Member could not participate in Firm democracy. Here, LeClair gave his notice, via email, on July 26, 2019, terminating his membership "effective immediately" and resigned employment as of August 4, 2019, noting the waiver, under 2.02(h) of the 30-day notice period. (JA 627.) As such, LeClair lost the right to vote as a Member

---

[20]   Article I "Certain Definitions" further lends support to this:  Section 1.01(xx) defines "Membership Interest" as "an interest in the Company owned by a Member . . . as applicable, . . . (c) to vote on, consent to *or* otherwise participate in any decision of the Members as provided in this Agreement . . . ." (emphasis added).  Thus, the explicit removal of this right in Section 9.08(g), which is otherwise a defining factor in determining holding of a membership interest, cannot be overlooked.

[21]   Section 2.02(h) requires a notice period of thirty days before a Member's termination but allows that the requirement may be waived or notice period shortened "in the sole discretion of the Chief Executive Officer, provided that no shortening of the notice period . . . shall negatively affect any substantial right or expectation of the Withdrawing Member."  Here, the Firm's CEO Erik Gustafson waived the notice period, memorializing the decision to do so in a July 26, 2019 email to all members of the Firm.  (JA 625.)  However, this does not affect the rights of LeClair, as the Operating Agreement already limited and excepted the right at issue — the right to vote — in Section 9.08(g), and the waiver did not alter this.

between July 26, 2019, and his last date of employment.  The July 29, 2019 meeting that ratified the Dissolution Resolution fell during this time period, meaning that LeClair lacked the ability to vote during the meeting.

Despite the limitation on LeClair's ability to vote during the meeting, LeClair and his fellow Appellants argue that the Dissolution Resolution did not conform to the Operating Agreement under Section 9.08(i)'s "Preferred Share Protective Provisions."  The provision states:

> At any time when Preferred Shares are outstanding, the Company shall not, either directly or indirectly by amendment, merger, consolidation, statutory share exchange, or otherwise, do any of the following without (in addition to any other vote required by law, this Agreement or Management Statement) the written consent or affirmative vote of the holders of a majority of the then outstanding Series A Preferred Shares and Series B Preferred Shares taken together as a single class . . .
>
> (i) *liquidate, dissolve, or wind-up the business* and affairs of the Company, effect any Deemed Liquidation Event, or consent to any of the foregoing . . . .

(emphasis added).  It remains undisputed that this section applies here, as a dissolution event occurred on July 29, 2019.  *See infra* Section IV.B.4.

Appellants thus argue that as LeClair held forty-five percent of the then-outstanding Preferred Shares, *see* (JA 149 (LeClair holds 213.68 Shares of Series A Preferred)), the dissolution could not have occurred without his consent.[22]  However, under Section 9.08(g), at the time of the dissolution event, LeClair could not tender *any* vote, as he remained in the Notice Period, during which he held Shares — which would be redeemed on his final day of employment, unless dissolution occurred — but lacked the right to vote.  The Court thus reads

---

[22]     Appellants do not offer any argument that any other Member's vote was required to ratify the dissolution, as LeClair remained the single largest shareholder at the time.  Thus, the Court only addresses the need, or lack thereof, for LeClair to affirm or deny the resolution.

Section 9.08(i) as requiring the vote of the majority of then outstanding Preferred shares *entitled to vote*; it cannot be that LeClair lacked the ability to vote under every other provision but was required to vote under only this provision. *Cf. Levine v. Emp'rs Ins. Comp. of Wausau*, 887 F.3d 623, 627 (4th Cir. 2018) ("[E]ach phrase and clause of a [ ] contract should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done, so as to effectuate the intention of the parties as expressed therein.") (quoting *TravCo Ins. Co. v. Ward*, 284 Va. 547, 552 (2012)).

Furthermore, the Court rejects the argument that even if LeClair could not vote, the Firm required his written consent to ratify the dissolution. Section 9.08(i) requires, for the enumerated events, such as dissolution, "the written consent *or* affirmative vote . . . given in writing *or* by vote at a meeting, consenting *or* voting (as the case may be) . . . ." (emphasis added). Outside of Section 9.08(i)'s specific voting requirements, Section 9.08(g) allows for one vote per share at a meeting or that "Member votes *may* be taken by written ballot."

The Court applies the plain meaning rule to these provisions, focusing on the repeated use of the word "or." Defined as "a function word to indicate an alternative," courts have repeatedly held that "or" "is almost always disjunctive." *Or*, Merriam-Webster, https://www.merriam-webster.com/dictionary/or (last visited Dec. 11, 2022); *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1141 (2018) (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)). Furthermore, the Operating Agreement's Section 1.02 ("Interpretation") states: "In this Agreement, unless a clear contrary intention appears: (a) references to 'or' shall be deemed to be disjunctive but not exclusive[.]" Thus, "or" in the Operating Agreement operates as an inclusive (or not exclusive) "or," meaning that one could select options "A or B, or both." *See* Reed Dickerson, *The Difficult Choice Between "And" and "Or"*, 46 Am. Bar Assoc. J. 310, 310

(1960) ("[I]t is not always clear whether the writer intends the inclusive 'or' (A or B, or both) or the exclusive 'or' (A or B, but not both).").  Therefore, while Members could vote via affirmative vote at a meeting *and* via written consent, one is sufficient alone; there is no need for both a vote and consent.  Either can stand in place of the other, or both can be used together, but it is never required that both take place.

Additionally, Section 9.08(k) outlines what actions may be taken without a meeting:

> Any action that may be taken at any annual or special meeting of Members may be taken without a meeting and without prior notice if the action is taken by Members who would have been entitled to vote at a meeting of Members of outstanding shares having voting power to cast not less than the minimum number . . . of votes that would be necessary or take the action at a meeting at which all Members entitled to vote thereon were present and voted.

This section demonstrates again that (1) a meeting is not required, nor a meeting vote, and instead written confirmation can alone suffice, and (2) that a member can only give written consent if the member could vote at the meeting.  As LeClair would not "have been entitled to vote at a meeting of Members," he could not take parallel actions outside of the meeting. § 9.08(k).  Therefore, as LeClairRyan Members took an affirmative vote during the meeting on July 29, 2019, that vote alone sufficiently ratified the dissolution.  LeClair did not need to provide written consent under the Operating Agreement as well.  Nor did LeClair need to, nor could he, subsequently ratify the vote through writing or his actions.

Because the majority of the Firm's Members affirmatively voted during a Members' meeting to dissolve the Firm, dissolution occurred pursuant to the Operating Agreement, regardless of LeClair's lack of participation in the process.  Finding that the Members validly adopted the Dissolution Resolution, the Court now turns to the Effective Date of the Resolution.

#### 4.    LeClairRyan's Effective Date of Dissolution was July 29, 2019.

The Court finds that the Dissolution Resolution was adopted on July 29, 2019.  Applying

principles of contract interpretation to the Resolution, pursuant to Virginia law, *TM Delmarva*

*Power*, 263 Va. at 119, contracts should be construed as a whole and with regard to their plain

meaning and natural language.  *Bridgestone/Firestone, Inc.*, 250 Va. at 407.  Here, the language

begins:

> Whereas, the Board of Directors has determined that it is in the best interests of
> LeClair Ryan LLC and its Members and other stakeholders that the Firm be
> dissolved and liquidated in accord with, and pursuant to (i) the Fourth Amended
> and Restated Operating Agreement of LeClair Ryan, P.C. and Operating
> Agreement of LeClair Ryan PLLC dated as of February 27, 2018 and (ii)
> applicable provisions of the Virginia Limited Liability Company Act.

(TA 200 (cleaned up).)  The Resolution continues, "W[hereas], the Members agree that it is in

the best interests of the Firm and its Members and other stakeholders that the Firm be dissolved

and liquidated in accordance with, and pursuant to, the Operating Agreement and applicable

provisions of the LLC Act[.]"  (TA 200.)

Contract preambles can guide the interpretation of the contract and provide context and

insight into the intent of the contracting parties.  *Yselta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929,

1943 n.4 (2022) ("[C]ourts regularly consult preambles and recitals even in statutes

and contracts.").  Here, through the preamble, LeClairRyan's Board and Members clearly

indicated that they believed that dissolution and liquidation of the Firm should occur, and the rest

of the contract must be guided by this reading.

Additionally, the body of the Resolution also proclaims that dissolution occurred: "Now,

therefore, be it resolved, *that the Firm shall be dissolved,* consistent with the provisions hereof

and upon the Effective Date established by the Dissolution Committee . . . ."  (TA 200 (emphasis

added).))  The plain meaning of the provision clearly demonstrates that dissolution had occurred

on the effective date set. *Cf. Holland v. Pardee Coal Co.*, 269 F.3d 424, 431 (4th Cir. 2001) (holding that the word "shall" "is generally construed to be mandatory"). Thus, the body of the Resolution holds that dissolution occurred on the Effective Date. In this vein, the Resolution continued that "such dissolution to be effective as of such date as the Dissolution Committee shall determine (the 'Dissolution Effective Date')." (TA 200.)

However, the Resolution sets forth no Effective Date, nor does the appellate record provided to the Court by the Parties. Appellants further contend that the Dissolution Committee never set an Effective Date and, thus, dissolution never occurred, on July 29, 2019, or any other date. This interpretation contravenes the Operating Agreement, however. When there is ambiguity in a writing, as here, the Court can look outside of the four corners of the writing to aid in divining the intent of the parties. *See Aetna Cas. & Sur. Co. v. Fireguard Corp.*, 249 Va. 209, 215 (1995) ("When a contract is ambiguous, however, a court should resort to parol evidence to ascertain the true intention of the parties."). Additionally, the Members adopted the Dissolution Resolution pursuant to and in accordance with the Operating Agreement. Thus, the Agreement provides a gloss as to how the Resolution should be read.

In Section 11.01 of the Operating Agreement, dissolution occurs upon any of the following "Events of Dissolution":

> The Company shall be dissolved and its affairs wound up *only* upon the occurrence of any of the following events:
>
> (a) An election to dissolve the Company made by holders of a majority of the Common Shares;
> (b) The sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or
> (c) The entry of a decree of judicial dissolution.

(emphasis added). There is no room in the Operating Agreement for dissolution at any other time or due to any other action, other than the events above. The word "only" underscores this.

33

"Only," *Merriam-Webster*, https://www.merriam-webster.com/dictionary/only  (last visited Dec. 11, 2022) (defining "only" "as a single fact or instance and nothing more or different").  Thus, the Court interprets Section 11.01 to mean that the provision encompasses all potential occurrences that lead to dissolution due to the inclusion of "only."  Of the three options set forth in Section 11.01, subsection (a) ("[a]n election to dissolve the Company") alone applies here, as no sale, exchange, conversion, transfer or judicial dissolution has occurred.  And because an election was made, as listed in (a), then a dissolution occurred upon the election.  A dissolution committee later choosing when dissolution occurs is not listed.

Additionally, Section 11.02 defines "Effectiveness of Dissolution" as ". . . effective on the day on which the event described in Section 11.01 occurs, but the [Firm] shall not terminate until the winding up of the [Firm] has been completed, the assets of the [Firm] have been distributed as provided in Section 11.03 [Liquidation] and the Articles shall have been cancelled as provided in Section 11.04 [Cancellation of Certificate]."  Therefore, as Section 11.01's event ("an election to dissolve the [Firm]") occurred on July 29, 2019, the Effective Date also became July 29, 2019, under the Operating Agreement.  While the Trustee correctly notes that the Firm has not yet legally, fully dissolved under Virginia law, Section 11.04 and the latter half of Section 11.02 contemplate this.  Section 11.04 distinguishes between dissolution, under Sections 11.01 and 11.02, and termination of the Company, which results from cancellation of the Firm in the Commonwealth of Virginia.

Additionally, the Court reads the Resolution in conjunction with the Virginia LLC Act, as referenced in the first two provisions of the Resolution.  (TA 200 (". . . the Firm be dissolved and liquidated in accordance with . . . applicable provisions of the LLC Act").)  Article 9 of the Virginia LLC Act governs dissolution:

34

A limited liability company organized under this chapter is dissolved and its affairs shall be wound up upon the happening of the first to occur of the following events:

1. At the time or on the happening of any events specified in writing in the articles of organization or an operating agreement;
2. Upon the unanimous written consent of the members;
3. The entry of a decree of judicial dissolution under § 13.1-1047;
4. Automatic cancellation of its existence pursuant to § 13.1-1050.2; or
5. Involuntary cancellation of its existence pursuant to § 13.1-1050.3.

Va. Code Ann. § 13.1-1046. Here, only the first event remains relevant: "At the time of or on the happening of any events specified in writing in . . . an operating agreement." *Id.* As the Operating Agreement lists voting for a dissolution by the majority of Members, Op. Agmt. § 11.01, this statutory provision governs when dissolution occurs "upon the happening" of that event. For LeClairRyan PLLC, this meeting and vote took place on July 29, 2019. Therefore, the Company was dissolved "at the time or on the happening of" that event.

Thus, the Resolution must be read in light of the Operating Agreement and the Virginia LLC Act taken together. The Virginia LLC Act states that dissolution of a limited liability company organized under the Chapter — which the Firm was — is dissolved upon the "happening of an event" specified in writing in an operating agreement "at the time" of the event. Va. Code Ann. § 13.1-1046. The Operating Agreement of LeClairRyan says that "[t]he Company shall be dissolved . . . upon the occurrence of . . . [a]n election to dissolve the Company made by holders of a majority of the Common Shares[,]" which occurred, and was memorialized in the Resolution, on July 29, 2019. Op. Agmt. § 11.01. As such, once an election took place in which Members voted to dissolve the Firm, the Firm dissolved. No need existed for a later Effective Date as the event already occurred; the Firm's Effective Date consisted of the date that the majority of Members voted to dissolve the Firm, July 29, 2019, as memorialized

35

in the July 29, 2019 Resolution.  Therefore, the Members dissolved the Firm on July 29, 2019, notwithstanding the language in the Resolution regarding an Effective Date.[23]

As dissolution occurred on July 29, 2019, the Court now turns to whether Members of the Firm who owned shares on July 29, 2019, could terminate their Membership following dissolution.

### 5.     Membership could not terminate after July 29, 2019.

In determining whether Members could leave the Firm following a vote of dissolution, the Court again turns to LeClairRyan's Operating Agreement.  While Section 2.02 governs termination of membership in conjunction with termination of employment, context also matters, and whether termination could occur post-dissolution turns instead on the interpretation of Section 5.03.

The Operating Agreement provides that if a Member sought to leave the Firm, the Member's Common and Preferred Shares would be "deemed sold and transferred to the company as of the Termination Date."  Op. Agmt. § 2.02(g).  In relevant part, Section 2.02(a) reads:

> [I]n the event of (i) the *termination of a Member's employment with the Company* . . . the Company or its Assignees, as applicable, *shall purchase and redeem from the transferring Member* [] and the transferring member shall sell to the company or its assignees, as applicable, all Shares of Section 2.02 Common and all Shares of 2.02 Preferred held by the Transferring Member[24] *immediately prior to termination of his or her employment* or change in attorney classification . . . .

---

[23]     Contract interpretation guides us not to read out language in a contract, but the parties also argue that language in the Resolution can be severed and not nullify the entirety of the Resolution.  The Court declines to address the severability issue, as the Resolution's reference to an Effective Date can harmoniously remain in the Resolution without needing to be severed.

[24]     "'Transferring Member' refers to, as applicable and as the context may require, the deceased, disabled, retired or terminated Member."  Op. Agmt. § 2.02(a).

(emphasis added). Thus, as a general rule, Membership in LeClairRyan and employment at the Firm went hand-in-hand; when an attorney chose to end their employment with the Firm, they could not retain their Membership, and vice versa, one could not become a Member of LeClairRyan without the Firm employing them as an attorney.

Further emphasizing this fact, Section 2.02(g) continues:

> The Transferring Member's Section 2.02 Common and Section 2.02 Preferred to be purchased by the Company following the Termination Date . . . *shall be deemed sold and transferred to the Company as of the termination Date,* irrespective of whether the Transferring Member actually delivers the Certificate(s) evidencing the Purchased Stock or any other transfer documents requested by the Company.

(emphasis added). The termination date of employment thus defines the termination date of Membership, regardless of form or formality. The Operating Agreement defines "Termination Date" as the "effective date of the termination of the Transferring Member's employment with the Company." *Id.* § 2.02(a)(i). Therefore, when a Member left the Firm, on the last date of employment, their shares were deemed transferred back to LeClairRyan.

Thus, the general rule under the Operating Agreement states that Membership ceases on the last day of employment of the Member at the Firm. Here, Appellants do not contest that their Memberships existed on the date of dissolution, July 29, 2019.[25] However, Appellants do contest whether they remained Members following their subsequent resignations from the Firm. But the Trustee correctly pointed out in her Motion to Authorize that Appellants' Membership continued to exist independent of their employment. All of the Appellants' employment terminated by September 2019, a necessity because the Firm no longer existed post-dissolution except for wind-up purposes, and LeClairRyan attorneys could not continue to practice law at the

---

[25] *See supra* note 6 (listing Appellants' termination dates and noting a possible exception).

Firm following July 29, 2019.  However, it does not follow that the Membership of Appellants

ceased that same day post-dissolution.  While under Section 2.02, Appellants' terminations

would sever their memberships from the Firm, Section 2.02 does not alone control.  Following

an event of dissolution, the Court must also consider Section 5.03 of the Operating Agreement,

which explicitly excepts Membership termination from occurring post-dissolution.

Section 5.03 provides an exception to Section 2.02's blanket resignation-and-redeem

rule:  once the Members voted to dissolve the Firm, individual Members could no longer

withdraw or resign from the Firm.  Section 5.03 states in pertinent part:

> So long as a Member continues to hold any shares, such Member *shall not have
> the ability to withdraw or resign as a Member prior to the dissolution and
> winding up of the Company* and any such withdrawal or resignation or attempted
> withdrawal or resignation by a Member prior to the dissolution or winding up of
> the Company shall be null and void and of no force or effect. . . .

(emphasis added).  Section 5.03's exception applies here.  As Members voted to dissolve the

Firm on July 29, 2019, *supra* Section IV.B.3–4, Members thereby lost their ability to resign their

membership in LeClairRyan.

Appellants correctly note that Section 5.03 continues:  "As soon as any Person who is a

Member ceases to hold any Shares, such Person shall no longer be a Member."  However, this

sentence does not apply here.  The sentence contemplates Members who otherwise would *not* be

affected by the rest of the provision, such as when a Member resigns before the dissolution

process begins or when an attorney changes employment type such that they remain employed at

the Firm but do not retain Membership.  Thus, while the proposition remains true on its own, all

Appellants held shares and, thus, *were* Members at the time of the vote of dissolution — if not

then they could not have voted to dissolve in the first place.  Consequently, they cannot argue

that they were not Members for purposes of Section 5.03.  Therefore, the operative section of the

provision remains the first sentence: "Such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation . . . shall be null and void and of no force and effect." *Id.* § 5.03.

The Court has already determined that dissolution occurred on July 29, 2019. *See supra* Section IV.B.4. The Operating Agreements' sections controlling dissolution provide that the effective date of a dissolution is the date of a vote, or other dissolving event, not the date of the certificate of cancellation being filed with the Commonwealth. Op. Agmt. § 11.01–02. As dissolution had occurred, but the winding up of the Firm had not yet been completed, Members remained unable to resign their Membership from the Firm.

Appellants may not have considered when ratifying the Firm's dissolution that their Membership, and its consequences, would continue post-employment. The Operating Agreement's drafters contemplated this exact situation, however, and Members ratified both the Dissolution Resolution and Operating Agreement. The Court will not redraft these documents based upon Appellants' displeasure with their current situation; when the language is clear and unambiguous, courts apply the plain meaning to best fulfill the contracting parties' expectations. *See Foothill Cap. Corp.*, 259 B.R. at 844 ("[W]here the parties' intent is clear and contractual language amendable to only one reasonable expectation, courts are to construe contractual language according to its plain and ordinary meaning.").

The Firm voted to dissolve on July 29, 2019, in accordance with Section 11.01(a) of the Operating Agreement, and such dissolution became effective on the same date, per Section 11.03 of the Agreement. Thus, pursuant to Section 5.03, Members could no longer withdraw or resign from Membership of the Firm following July 29, 2019. As such, LeClair's resignation of his membership on July 31, 2019, was "null and void and of no force and effect." Op. Agmt. § 5.03.

So too the other Appellants' resignations. As all Appellants attempted transfer of their Memberships back to the Firm following the Effective Date of dissolution, their transfers failed. Because the Court has determined that, pursuant to Section 5.03 of the Operating Agreement, all Appellants remained Members of the Firm following July 29, 2019, the Court now turns to the question of the correct date for the ESH List.

>    **6.    The ESH List should be dated as of the bankruptcy Petition Date, September 3, 2019, but this does not change Appellants' status on the list.**

The Trustee argues that July 29, 2019, the date of dissolution, remains the correct date of the ESH List.[26] In contrast, Appellants argue that the ESH List should be dated as of September 3, 2019, the Petition Date. The Bankruptcy Court agreed with the Trustee, ruling that "the critical date is the dissolution date . . . on July 29, 2019." (JA 831.) The Court finds that the Petition Date, September 3, 2019, constitutes the correct date of the list, but that the ESH List remains the same, regardless of date, as Members could not withdraw or resign their Membership after July 29, 2019. *See supra* Section IV.B.5.

The filings of a bankruptcy proceeding, including its statutorily required lists and schedules, are generally viewed as a snapshot of the debtor's financial status as of the petition date, or date of filing. *Cf. In re Dowd*, 607 B.R. 833, 837 (Bankr. E.D. Va. 2019) (holding that a bankruptcy court makes determinations based upon "a snapshot of the Debtor's finances as of the petition date"). Furthermore, schedules, such as the ESH List, give almost immediate notice to parties in interest of a company who enters bankruptcy. *See, e.g.*, Fed. R. Bankr. P. 2002(d)

---

[26]    The List of Equity Security Holders Pursuant to Rule 1007(a)(3) of the Federal Rules of Bankruptcy Procedure begins: "[t]he Debtor submits that the individuals identified below were the members of LeClairRyan PLLC as of July 29, 2019, which is the date the members resolved to dissolve the firm[.]" (JA 146.) On the final page, the List is dated September 17, 2019, fourteen days after the filing of the bankruptcy petition.

(requiring notice to equity security holders); Fed. R. Bankr. P. 1007(a)(3) ("In a chapter 11 reorganization case, . . . the debtor shall file *within 14 days after entry of the order for relief* a list of the debtor's equity security holders . . .") (emphasis added).  While there is no statutory provision that requires a specific date for petition-related filings, the statutory context of the schedules being required on or shortly after filing of a bankruptcy petition, and the notice-based purpose of such lists, suggest that the required filings should be as of the date of petition.

With that in mind, no debate exists between the Parties that the Firm's Operating Agreement, in conjunction with the statutory provisions defining Chapter 11 schedules, defines membership on the Equity Security Holder List.  The Agreement's "Definitions" Section 1.01(hh) defines "Equity," in relevant part, as "all Common, Preferred and other units of capital stock or Membership Interests of the Company now and hereafter outstanding . . . ."  Similarly, under Section 1.01(ii), "Equity Securities" "means (i) any Equity of the Company[.]"  As Members retain Membership based upon their holding of Common or Preferred Stock and, thus, Equity, they are Equity Security Holders, as defined by the Operating Agreement and pursuant to Bankruptcy Rule 1007, for purposes of an Equity Security Holders List.  Appellants remained Members of LeClairRyan on the Petition Date of September 3, 2019, just as they were Members on July 29, 2019.  Thus, the Debtor-Firm correctly listed them on the ESH List, regardless of the List being dated as of July 29 or September 3, 2019.

The Court therefore AFFIRMS the Bankruptcy Court's denial of the Motion to Amend and accompanying Motions for Joinder.  However, on remand, the Bankruptcy Court shall correct the date of the ESH List to be September 3, 2019.

**C.      The Trustee waived the *res judicata* argument as she did not raise it below.**

Lastly, the Court need not address the Trustee's *res judicata* argument as she did not raise it in front of the Bankruptcy Court.  Issues are waived unless raised below and an appellate court will not consider an unraised issue for the first time on appeal, absent extraordinary circumstances.  *See In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014) ("When a party in a civil case fails to raise an argument in the lower court and instead raises it for the first time before us, [the court] may reverse only if the newly raised argument establishes 'fundamental error' or a denial of fundamental justice.").  While subject matter jurisdiction can never be waived or forfeited, *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012), this exception does not apply to *res judicata*.  "It is settled that *res judicata* is an affirmative defense which must be affirmatively raised.  Failure to raise the defense results in waiver."  *Kittle v. Dir., Off. of Workers Comp. Programs, U.S. Dept. of Lab.*, 1992 WL 158866, at *1 (4th Cir. July 10, 1992) (citing *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 607–08 n.19 (1975) and *Crowe v. Cherokee Wonderland, Inc.*, 379 F.2d 51, 54 (4th Cir. 1967)).  This waiver equally occurs on appeal from bankruptcy court proceedings.  *See S. Mgmt. Corp. Ret. Trust v. Rood*, 532 Fed. App'x 370, 372 (4th Cir. July 10, 2013) (finding no abuse of discretion when district court declined to address *res judicata*, "which was raised for the for the first time on appeal," because "the defense is waived").  When, as here, "[t]here is no indication in the pleadings filed before the Bankruptcy Court or anywhere in the official appellate record that the [Trustee] previously raised the defense of *res judicata*[,] consequently, [she] ha[s] waived the defense."  *Morehead v. Waldock Inv. Co.*, 2006 WL 1966970, at *6 (N.D.W.V. July 12, 2006).  Thus, the Court declines to address the Trustee's *res judicata* arguments.

## CONCLUSION

The Court AFFIRMS IN PART the Bankruptcy Court's Order regarding the Motion to Authorize as to the Trustee's continued reliance on the current ESH List. The Court REVERSES IN PART to the extent that the Bankruptcy Court improperly ruled that the Trustee may rely on future revisions of the ESH List, as that aspect of the Bankruptcy Court's ruling constituted an improper advisory opinion. In doing so, the Court REMANDS to the Bankruptcy Court to strike the following language from the Bankruptcy Court's Order: "To the extent there is any Revised ESH List, the Trustee, directly and/or through her professionals, is authorized to rely on the Revised ESH List." (JA 867).

The Court further AFFIRMS the Bankruptcy Court's Order denying the Motion to Amend and the accompanying Motions for Joinder. The Court holds that the current ESH List's membership remains accurate. However, on remand, the Bankruptcy Court shall also correct the date of the ESH list to be September 3, 2019. Again, the Court makes no findings regarding the potential tax implications of ESH List membership, as that question is not before the Court.

An appropriate order shall issue.

The Clerk is directed to file a copy of this Memorandum Opinion electronically and notify all counsel of record, as well as United States Bankruptcy Judge Kevin R. Huennekens.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date: January 4, 2023

43